IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:24CR289 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | |
| | ) | |
| MATTHEW MOTIL, | ) | UNITED STATES' SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | |

The United States of America, by and through its counsel, Acting United States Attorney Carol M. Skutnik, and Erica D. Barnhill, Assistant United States Attorney, respectfully submits this memorandum setting forth the United States' position regarding the sentencing of Defendant Matthew Motil. For the reasons set forth below and those to be articulated at the sentencing hearing, the United States respectfully asks that this Court apply upward adjustments for a loss amount greater than $3.5 million, five or more victims suffering substantial financial hardship, and use of a special skill; decline to apply the zero-point offender adjustment; and set Motil's total offense level at 28 after acceptance of responsibility. The United States further requests that this Court impose a sentence within the resulting 78 to 97 month Guidelines range and order Motil to pay restitution of $5,085,247.08.

I.  **FACTUAL BACKGROUND**

Beginning in 2017, Matthew Motil held himself out as an expert in real estate investing and solicited funding from individual investors through various social media channels to purchase/rehab houses in exchange for promissory notes guaranteeing between 8% and 15% annual returns secured by purported "first lienholder" mortgages. (R. 10: Plea Agreement, PageID 54-56). Motil led investors to believe that he or she had the only mortgage on a given

property; however, Motil did not record the overwhelming majority of the investors' mortgages and re-sold "first" mortgages multiple times on the same properties without the knowledge of the other investors, resulting in up to nineteen different investors holding the "first mortgage" on a single property. (*Id.*, PageID 56-57; Exhibit 2, Compilation of Property Purchases (filed under seal)). Motil then used the investor money to pay earlier investors, to operate his gym business, and to fund his personal expenses. (*Id.*, PageID 58; R. 31-10: Defendant's Sentencing Memorandum Exhibit J, Disposition of Investor Deposits, PageID 616-624). Motil's repeated mortgaging of the properties caused the properties to be extremely overleveraged, with "mortgages" vastly exceeding the value of a property. (R. 10: Plea Agreement, PageID 58-64). The scheme began to collapse in March 2021, and Motil emailed his investors that he had enlisted a number of realtors to list and sell all but three of the properties in order to repay all of the investors. (*Id.*, PageID 64). Despite this, between March and May 2021, Motil successfully solicited at least four more investors to invest as "first lienholders" on two of his already-overleveraged (and already "first" mortgaged many times over) properties. (*Id.*, PageID 64, 58-60). Motil filed for Chapter 7 bankruptcy on March 7, 2022. (R. 15: PSR, PageID 263, ¶ 82).

II.     **APPLICABLE LEGAL STANDARDS**

A well-established legal framework guides the Court's sentencing determination. The advisory Guidelines range serves as "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007); *see also United States v. Collington*, 461 F.3d 805, 807 (6th Cir. 2006). The Guidelines thus remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses. The Sentencing "Commission fills an important institutional role: It has the capacity courts lack to 'base its determination on empirical data and national experience, guided by a professional staff with appropriate expertise.'" *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (internal citation omitted).

After determining the appropriate Guidelines range, the Court then turns to the familiar factors set forth in 18 U.S.C. § 3553(a): the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

### III. SENTENCING GUIDELINES COMPUTATION

The parties' offense level calculation in the plea agreement contains both an agreed calculation and additional disputed adjustments. (R. 15: Pre-Sentence Report ("PSR"), PageID 248, ¶ 2). The parties agreed that the base offense level is 7. The parties have no agreement about whether, and, if so, to what extent, certain specific offense characteristics and other Guideline adjustments apply (collectively, the "Disputed Adjustments"). The parties agreed that these Disputed Adjustments are the following:

| Disputed Adjustment Description | Potential Effect | U.S.S.G. Section |
| --- | --- | --- |
| Actual or Intended Loss Amount | Wide Range | § 2B1.1(b)(1) |
| Number of victims, and number of victims suffering substantial financial hardship | + 2, +4 or +6 | § 2B1.1(b)(2) |
| Abuse of position of trust or use of special skill | 0 or + 2 | § 3B1.3 |
| Zero-point offender | 0 or - 2 | § 4C1.1 |

(*Id.*) The parties agreed that each side is free to argue for or against any Disputed Adjustment under the applicable Sentencing Guidelines provisions and relevant application notes. Depending on which (if any) of the adjustments the Court applies, Motil's final offense level after acceptance of responsibility could range from **22 to 30**.

For the reasons set forth below, this Court should set the loss amount at greater than $3.5 million but less than $9.5 million (+18), apply the adjustments for more than five victims suffering substantial financial hardship (+4) and use of a special skill (+2), and decline to apply

3

the zero-point offender adjustment (-0), resulting in a total adjusted offense level after acceptance of responsibility (-3) of **28**.

  A. <u>THE LOSS AMOUNT WAS GREATER THAN $3.5 MILLION BUT LESS THAN $9.5 MILLION</u>

Motil concedes that the appropriate loss amount is greater than $3.5 million but less than $9.5 million (R. 31: Defendant's Sentencing Memorandum, PageID 488). The government concurs. This calculation is also consistent with the conclusions of the Presentence Report. (R. 15: PSR, PageID 256, ¶ 39). This Court should therefore add 18 levels to Motil's Guidelines calculation for loss.

  B. <u>MORE THAN FIVE VICTIMS SUFFERED SUBSTANTIAL FINANCIAL HARDSHIP AS A RESULT OF MOTIL'S FRAUDULENT CONDUCT</u>

The Court should apply a four-level enhancement because more than five victims suffered substantial financial hardship as a result of Motil's criminal conduct. The Guidelines call for a four-level increase in the offense level where the offense resulted in "substantial financial hardship to five or more victims." U.S.S.G. § 2B1.1(b)(2)(B). In Application Note 4(F), the Guidelines direct the court, in determining whether the offense resulted in "substantial financial hardship" to a victim, to "consider, among other factors, whether the offense resulted in the victim … suffering substantial loss of a retirement, education, or other savings or investment fund" as well as "making substantial changes to his or her employment, such as postponing his or her retirement plans" and "making substantial changes to his or her living arrangements, such as relocating to a less expensive home." U.S.S.G. § 2B1.1 app. n. 4(F)(iii), (iv), (v). The victim enhancement advises sentencing courts to "consider the extent of the harm rather than merely the total number of victims of the offense … in an effort to 'place greater emphasis on the extent of harm that particular victims suffer as a result of the offense.'" *United States v. Howder*, 748 Fed. Appx. 637, 642 (6th Cir. 2018), quoting *United States v. Poulson*, 871 F.3d 261, 267 (3d Cir.

4

2017) (internal citations omitted). This approach is "'[c]onsistent with the [Sentencing] Commission's overall goal of focusing more on victim harm' and 'ensures that an offense that results in even one victim suffering substantial financial harm receives increased punishment, while also lessening the cumulative impact of loss and the number of victims, particularly in high-loss cases.'" *Id.* (quoting United States Sentencing Commission, *Guidelines Manual*, Supplement to Appendix C 112-13 (Nov. 1, 2015)). The Sixth Circuit has recently reiterated that the financial hardship a defendant caused to his victims "'need not fall perfectly' within the factors in the application note to be considered substantial." *United States v. Hanson*, 124 F.4th 1013, 1017 (6th Cir. 2025), citing *United States v. Histed*, 93 F.4th 948, 961 (6th Cir. 2024). Additionally, a sentencing court a may make reasonable inferences about the victims' financial circumstances and about their level of financial harm, so long as those inferences find some support in the record. *United States v. Howder*, 748 Fed. Appx. 637, 644 (6th Cir. 2018).  In evaluating whether harm was "substantial," the Sixth Circuit in *Howder* turned to the Seventh Circuit's explanation in *United States v. Minhas*, 580 F.3d 873, 878 (7th Cir. 2017):

> The inclusion of the word 'substantial' implies that the loss or hardship must be significant, meaning at least more than minimal or trivial. But between a minimal loss or hardship (occurring, perhaps, when a defendant fraudulently obtains five dollars a victim had intended to donate to a charity), and a devastating loss (occurring in the wake of a scheme to wipe out a victim's life savings), there lies a wide range in which we rely upon the judgment of the district courts, guided by the non-exhaustive list of factors in Application Note 4.

A review of the harm Motil caused should lead this court to apply a four-level enhancement for more than five victims suffering substantial financial hardship.  The PSR notes that of the nine victim impact statements returned to date, five victims reported that the offense resulted in the substantial loss of a retirement fund.  (R. 15: PSR, PageID 256, ¶ 40).  A review of the submitted Victim Impact Statements is consistent with the PSR's conclusion.  (R. 15-2,

5

Victim Impact Statements, PageID 284, 307, 320, 327, 384).  Additionally, one victim also reported having to make substantial changes to their living arrangements (*Id.*, PageID 305), and one reported that the invested money was intended to provide financial support for a child with lifelong medical and care needs.  (*Id.*, PageID 361).

The Victim Impact Statements not only provide documentation about the amount of the victims' losses (which Motil does not appear to dispute), but also the effect those losses had on the victims (which he does).  However, Motil's arguments that the victims' losses do not rise to the level of substantial financial hardship merely disagree with the victims' representations of the personal effects of their financial losses.  Although the government bears the burden to establish contested enhancement factors by a preponderance of the evidence at sentencing, *United States v. Silverman*, 889 F.2d 1531, 1535 (6th Cir. 1989), where a defendant challenges the sufficiency of the evidence put forth by the government – here, the Victim Impact Statements describing the impact of the financial harm Motil caused – that "typically must be 'more than a [defendant's] bare denial … 'A defendant cannot show that a PSR is inaccurate by simply denying the PSR's truth … he must produce *some* evidence that calls the reliability or correctness of the alleged facts into question." *Small*, 988 F.3d at 257. (emphasis in original) (internal citations omitted).  Some of the victim impact statements describe the loss as "a huge sum of money" that was "a large chunk of our retirement so far" (PageID 320); having their retirement funds "almost completely drained" and having to adjust retirement dates as a result (PageID 307); losing money "substantial enough to set [the victims] back an estimated 5-7 years" on their savings (PageID 327); losing half of the retirement savings of a victim who "didn't have much saved up for retirement" before investing with Motil (PageID 284).  The types of losses the victims describe are clearly "substantial" as described in *Minhas*.  Additionally, courts in other circuits have

6

found substantial financial hardship in a range of cases where either the number of victims or the amount stolen was high.  *Hanson*, 124 F. 4th 1013, 1017 (collecting cases).  Both are the case here: defendant induced approximately 65 victim-investors to "invest" approximately $7.9 million with him, in amounts ranging from $3,000 to $577,240. (See Exhibit 1, Victim Loss and Restitution Spreadsheet, filed under seal).  The median investment amount across all victim-investors was $60,000.  By way of comparison, the Census Bureau reported a median annual household income in the United States of $78,538 for the years 2017 through 2023.  United States Census Bureau Quick Facts, https://www.census.gov/quickfacts/ fact/table/US/INC110223#INC110223 (last visited July 13, 2025).  Motil does not appear to be disputing the amounts invested, just the effect that losing that money had on the victim-investors; therefore, given both the absolute numbers as well as the victims' representations that these losses caused significant financial losses to at least five of them, this Court should find that the United States has sufficiently established substantial financial hardship and that the four-level enhancement under U.S.S.G. § 2B1.1(b)(2)(B) applies.

      C.      <u>MOTIL USED A SPECIAL SKILL TO CARRY OUT HIS FRAUD SCHEME.</u>

The Guidelines call for a two-level enhancement if the defendant used a "special skill" in facilitating the commission or concealment of the offense.[1]  U.S.S.G. § 3B1.3.  The application notes define "special skill" as "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing."  *Id*. app. n. 4.  Here, Motil held

---

[1] The same Guideline - § 3B1.3 – applies for both the use of a special skill and the abuse of a position of trust; although the United States asks the Court to apply the two-level enhancement, it asks that this Court do so because Motil used a special skill.  The United States concurs with Motil that the position of trust portion of the enhancement is inapplicable under the facts of this case.

7

himself out as a successful entrepreneur and expert in real estate investing, touting his Ph.D. and "expert" qualifications to attract investors and then using his Ohio real estate licensure to execute the scheme. Motil had a presence on multiple social media channels as well as a podcast, "Cash Flow King." He also authored a book, *Man on Fire: Lessons From a Perpetual Burnout on Creating Alignment for Success*, which touted his experiences "battling and overcoming the 9-to-5 grind, toxic coworkers, childhood illness, cancer, and countless failed attempts at gaining momentum to ultimately creating alignment, blasting through plateaus and designing a life worth living." Amazon.com product page, https://www.amazon.com/Man-Fire-Perpetual-Creating-Alignment/dp/0692842489 (last visited July 3, 2025). Motil's "About the Author" page on Amazon describes him as "a real estate entrepreneur, best-selling author, and host of the Cashflow King Podcast. He has worked with hundreds of investors from all over the world and helped them to grow massive wealth and passive income through remote real estate investments. … Dr. Motil stopped teaching higher education when he realized he was simply helping people become better employees and now teaches people how to do exactly what he did, use real estate investing to fire their bosses forever!" About the Author, https://www.amazon.com/stores/author/B01N17WDQK/about (last visited July 3, 2025).

Although § 3B1.3 lists specific professions as those that inherently require special skill, the list is not exclusive. See *United States v. Bush*, 252 F.3d 959, 2001 U.S. App. LEXIS 11843 (8th Cir. 2001) (Defendant, a former investment counselor and manager at a major national brokerage firm, was properly found to have used a special skill under § 3B1.3 to further fraudulent scheme to sell unregistered promissory notes, even though defendant claimed that no special skill was required to sell notes, since defendant's extensive training and experience allowed him to draw victims into his fraud more easily than someone without his skill, and

8

defendant's understanding of intricacies of executing promissory notes and collateralizing them helped him establish a scheme that an otherwise unskilled person might have found more difficult to set up.) The fact that Motil's purported real estate investment skills did not, in fact, produce the returns he touted to investors should not bar the application of the enhancement. The Sixth Circuit upheld the application of a special skill enhancement where a former attorney was convicted of conspiracy to commit money laundering, even though the documents she produced and arguments she made were devoid of real law, where she used her legal training to assist her coconspirator in the commission and concealment of his fraud, and used legal jargon and official-looking documents to disorient the bank and convince it not to promptly rescind payment from the coconspirator's account. *United States v. Tucci-Jarraf*, 939 F.3d 790 (6th Cir. 2019). Throughout his years operating his various companies, Motil used his purported special skill at real estate investing to lure investors into believing his promises of substantial returns. Motil should not be able to avoid responsibility for that "skill" simply because his claims have proven to be fraudulent. This Court should therefore apply the two-level enhancement for Motil's use of a special skill.

    D.    MOTIL SHOULD NOT RECEIVE THE ZERO-POINT OFFENDER ADJUSTMENT.

The Sentencing Guidelines call for a two-level reduction in the offense level if a defendant assessed no criminal history points and meets certain other criteria; the most relevant in this case is that he did not "personally cause substantial financial hardship." U.S.S.G. § 4C1.1(a)(1), (6). The guideline instructs the court to "consider, among other things, the non-exhaustive list of factors provided in Application Note 4(F) of the Commentary to § 2B1.1." U.S.S.G. § 4C1.1(b)(3). It is important to note that although both the victim enhancement under U.S.S.G. § 2B1.1(b)(2)(B) and (C) (more than five victims or more than twenty-five victims

9

suffered substantial financial hardship) and the zero-point offender adjustment under U.S.S.G. § 4C1.1 (defendant did not personally cause substantial financial hardship) require consideration of the same factors in Application Note 4(F) to make a determination of substantial financial hardship, the zero-point offender adjustment does not require a certain number of victims to have suffered substantial financial hardship – if the defendant personally caused substantial financial hardship, he is ineligible to receive the adjustment. As discussed above, multiple victim impact statements describe substantial financial hardship consistent with the list in Application Note 4(F). Therefore, this Court should find that Motil is ineligible for the zero-point offender adjustment under U.S.S.G. § 4C1.1 because he personally caused substantial financial hardship to at least one victim.

## IV. APPLICATION OF § 3553(A) FACTORS

After setting the final adjusted offense level at 28, reviewing the § 3553(a) factors should lead this Court to conclude that a sentence within the advisory Guidelines range – 78 to 97 months – is appropriate. The nature and circumstances of Motil's offenses, the need for the sentence imposed to reflect the seriousness of the offense and provide just punishment, and the need to afford adequate deterrence all argue strongly in favor of a Guidelines sentence.

While this case represents Motil's first criminal conviction, this is not an instance of an otherwise law-abiding individual making one bad choice at one distinct moment in time. Motil's fraud spanned years, during which he repeatedly made choice after choice to lie to and defraud investors. He could have stopped at any time; he could have recorded the mortgages as he promised. But day after day, week after week, month after month, year after year, Motil made affirmative choices to continue his fraud. He knowingly offered the "first" mortgage position to multiple investors for the same property and intentionally did not record the mortgages. Perhaps the most egregious example is the Hearthstone Road property: Motil intentionally lured nineteen

investors to "invest" over $1.3 million between January 2018 and January 2021 by promising to secure their investment with a first mortgage on a two-bedroom bungalow in Parma. The assessed tax value of the property at the time was $75,800. (R. 15: PSR, PageID 250, ¶ 15; Exhibit 2, Compilation of Property Purchases (filed under seal)). He carried out the same scheme on other properties he owned, obtaining funds that far exceeded the property's value in exchange for multiple "first" mortgages. This conduct is not a mistake, or one instance of bad judgment – it is deliberate, repeated, intentional, and criminal.

      Motil used the proceeds of the fraud both to continue the fraud – by making Ponzi payments to earlier investors using money obtained from later investors – as well as to fund his personal lifestyle. Motil filed for bankruptcy in 2022 and included his victim-investors in his petition as unsecured creditors. *In re Matthew Motil*, 22-10571 (Bankr. N.D. Ohio). Motil's Chapter 7 petition was challenged by the United States Trustee and eventually went to trial. See *Vara v. Motil*, 22ap1084 (Bankr. N.D. Ohio). Although Motil is correct that his discharge was ultimately denied because of the unauthorized transfer of a vehicle, this elides the fact that the bankruptcy court made numerous findings of fact regarding his fraudulent "investment" scheme, including Motil's lies to investors about recording the mortgages, encumbering his various properties with additional mortgages unbeknownst to the other mortgage holders, and using the proceeds of the invested money to fund his lifestyle. *Vara v. Motil*, Doc. 54: Memorandum of Opinion (June 13, 2013). The bankruptcy judge also found Motil's testimony that he believed the mortgages with investors would remain valid regardless of whether or not they were recorded to be not credible. *Id.*, p. 18. The bankruptcy court also determined that from 2019 through 2021, Motil's personal bank account paid $6,512.11 toward his personal credit card charges, while Motil's businesses collectively paid $323,629.48, including paying for a family trip to

11

Disney. *Id.*, p. 19-20. Although this is a small percentage of the overall money he received from investors, it is nevertheless an objectively substantial amount.

Although Motil's risk of recidivism appears to be low – with a felony conviction, Motil should no longer be able to put himself into a position where he has access to unwitting investors' money – the sustained length of his criminal conduct and the harm he caused are such that recidivism alone should not be a determinative factor in his sentencing. Additionally, any collateral consequences of Motil's conviction, such as the length of these proceedings, the fact that he is now convicted a felon, strain on his relationships with friends and family, and his embarrassment, if any, before his community, neighbors, and friends, should likewise not be considered by this Court. Consideration of these collateral consequences would tend to support shorter sentences for defendants from privileged backgrounds and would not satisfy the goals of sentencing. *United States v. Musgrave*, 761 F.3d 602, 606-07 (6th Cir. 2014). Further, because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, they are prime candidates for general deterrence. *Id*. *See also United States v. Panyard*, No. 07-20037-2, 2009 WL 1099257, at * 12 (E.D. Mich. April 23, 2009) ("White-collar crimes…are often perceived as carrying substantially lesser punishment than other comparable offenses," making deterrence imperative when determining sentencing.).

The PSR identifies Motil's history and characteristics as well as the need to avoid unwarranted sentencing disparities as potential grounds for a downward variance from the recommended Guidelines range. (R. 15: PSR, PageID 270, ¶ 118). However, Motil's history and characteristics are unremarkable for a white collar defendant, and his lack of criminal history is already accounted for in the offense level by the Guidelines placing him in Criminal History Category I. His regret and timely acceptance of responsibility for his criminal conduct is already

accounted for with a three-level reduction in his offense level calculation. Motil's education and background are not only not unusual for a defendant in a Ponzi scheme, but they were the very characteristics that gave him the sophistication and access to present a veneer of success and prey on unwitting investors. Motil's clean criminal history was one of the factors that allowed him to earn the confidence of people with money to invest. In other words, his lack of criminal record was the means by which he put himself in a position to enrich himself while defrauding others.

There is nothing in Motil's history or characteristics that warrants a downward variance from the advisory Guidelines level, especially not a variance as extreme as the one he proposes. A Guidelines sentence of 78 to 97 months would not create unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. Multiple recent Ponzi scheme sentences both in this District and nationwide have been substantially longer, reflecting the magnitude of the losses caused by these types of fraud schemes. *See*, *e.g.*, *United States v. Brenner*, No. 21-CR-772 (N.D. Ohio) (125 month sentence in $3.6 million investment fraud / Ponzi scheme); *United States v. Darayl Davis*, No. 18-CR-25 (N.D. Ill.) (160-month sentence in $5.1 million investment fraud / Ponzi scheme); *United States v. Jeremy Anderson*, No. 19-CR-23 (M.D. Fla.) (151-month sentence in $10 million Ponzi scheme); *United States v. Jeff Carpoff*, No. 20-CR-17 (E.D. Cal.) (30-year sentence in $1 billion Ponzi scheme); *United States v. Joshua Houchins*, No. 20-CR-245 (E.D.N.C.) (10-year sentence for $1.7 million Ponzi scheme). Additionally, a similarly-situated defendant in this District was recently sentenced to 65 months for a $4.7 million investment fraud / Ponzi scheme. *United States v. Matthew Turnipseede*, No. 22-CR-450 (N.D. Ohio). Therefore, a prison sentence within the

Guidelines range of 78 to 97 months (28/I) will meet the requirements for a sentence that is sufficient, but not greater than necessary, to comply with the purposes of 18 U.S.C. § 3553(a).

## V. RESTITUTION

As a preliminary matter, this Court is both obligated to order restitution under the provisions of 18 U.S.C. § 3663A and has the means to do so. More importantly, Motil agreed to pay full restitution as part of his plea agreement, including "restitution for all losses caused by the Defendant's criminal conduct" as determined by the court. (R. 10: Plea Agreement, PageID 48, ¶ 24-25).[2] Although this case involves both a significant loss amount and a substantial number of victims, determining the restitution amount is by no means so complex that the burden on the sentencing process outweighs the need to provide restitution to Motil's victims. 18 U.S.C. § 3663A(c)(3)(B).

### A. BOTH THE LOSS AMOUNT AND RESTITUTION AMOUNT CAN BE READILY DETERMINED.

The United States has provided both Probation and defense counsel with a spreadsheet of the government's calculation of the losses in this case based on available bank records and documentary evidence, calculating the loss amount for the victim-investors as **$5,040,862.49**.[3] (*See* Exhibit 1, Victim Loss and Restitution Spreadsheet, filed under seal). This amount represents the sum of the victim-investors' principal investments (which totaled $7,988,192.48)

---

[2] If Motil persists in requesting the Court not order restitution, the Court may wish to consider whether Motil has fully accepted responsibility and whether arguing against a restitution order breaches the plea agreement.

[3] The receiver's updated tabulation of the property sales is attached to Defendant's Sentencing Memorandum as Exhibit F (R. 31-6: Exhibit F, Property Liquidation Details, PageID 590-91). The United States does not dispute this accounting – which reflects four additional property sales that postdate the calculation the government provided to Probation and defense counsel in October 2024 – and has updated the government's calculations and loss/restitution spreadsheet accordingly. (See Exhibit 1, Victim Loss and Restitution Spreadsheet (filed under seal)).

14

less any payments made by Motil on or before the date of the filing of the first civil lawsuit in connection with the investment scheme (which totaled $2,807,552.35), *see* U.S.S.G. § 2B1.1 app. n. 3(D)(i) and (E)(iv), and less any credit from sales of the properties (which totaled $139,777.64), *see* U.S.S.G. § 2B1.1 app. n. 3(E)(ii). Motil has objected to the government's loss calculation (R. 15: PSR, PageID 30, Defendant's Objection to Paragraph 30) but has not provided an alternative calculation or articulated in what way(s) the government's calculation is erroneous.

        B.        <u>NEITHER THE RECOVERY BY THE INSTITUTIONAL LENDER NOR ISSUES WITH THE RECEIVERSHIP MAKE DETERMINING THE RESTITUTION AMOUNT TOO COMPLEX FOR THIS COURT TO FASHION AN ORDER OF RESTITUTION.</u>

During the same time period he was soliciting individual investors, Motil also obtained $2.65 million from an institutional lender secured by mortgages on some of his properties. As Motil himself points out, the institutional lender recouped nearly all of its $2.65 million loan when Motil's property portfolio was liquidated in the receivership. (R. 31: Defendant's Sentencing Memorandum, PageID 519). It is important to note that the reason the institutional lender was able to recover while the individual investors received nothing from the property sales is that the institutional lender *had a secured interest through recorded mortgages on the properties*. In contrast, Motil prevented the individual investors from being similarly situated because he intentionally failed to record their mortgages as part of his fraud scheme. Motil's failure to record the individual investors' mortgages, in addition to furthering his fraud by allowing him to offer "first" mortgages many times for the same property, also put the individual investors behind the institutional lender in the priority of creditors once his scheme inevitably collapsed. Motil is not a hapless victim of the fact that the institutional lender, not the victim-investors, reaped the overwhelming majority of the proceeds of the sales of his properties; he is

15

its cause. Motil was the one who made the choice, over and over again, not to record his investors' mortgages in order to conceal the extent to which the properties were already encumbered. The institutional lender simply availed itself of the rights all of Motil's investors *should* have had under their mortgages – the right to recover the proceeds of the sale of mortgaged properties when Motil failed to adhere to his contractual obligations. In short, not only did Motil lie to obtain the victim-investors' money, he did it in such a way that prevented them from ever being able to recover. If the institutional lender's loans are included along with the victim-investors in the loss and restitution calculation, it results in a total loss amount of $5,148,237.70 and a total restitution amount of **$5,085,247.08**.

Issues with the receivership are likewise unrelated to the issue of determining restitution. It is frustrating for the victim-investors and unfortunate for Motil that the proceeds for the sale of the properties was insufficient to repay all of his individual investors. However, the receivership is not something that just happened to Motil out of the blue – it was a direct consequence of how he chose to conduct his years-long fraud scheme. Whether the receivership was run well or poorly, Motil still owes the victim-investors the money he fraudulently obtained from them.

      C.      RESTITUTION SHOULD BE ORDERED PURSUANT TO 18 U.S.C. § 3663A AND THE PLEA AGREEMENT.

There is a sufficient basis for this Court to fashion a restitution order. A district court need not engage in "a precise mathematical inquiry"; rather, it must exercise its "discretion and sound judgment." *Paroline v. United States*, 572 U.S. 434, 459, 134 S. Ct. 1710, 188 L. Ed. 2d 714 (2014). In accordance with the submitted loss and restitution calculations as detailed in Exhibit 1 (filed under seal), the United States requests that restitution be ordered in the amount of **$4,977,871.87** for the victim investors and **$107,375.21** for the institutional lender for a total of **$5,085,247.08**. As discussed above, this amount represents the sum of the victim-investors'

16

principal investments less payments already made by Motil and less credits for the liquidated properties sold through the receivership as of the date of this filing.[4]

Any remaining uncertainties concerning payments that may yet be distributed to the victim-investors arising out of either the bankruptcy proceeding or any civil case are limited to potential additional credits toward Motil's restitution obligation. Because many of the victim-investors in this case are also creditors in the bankruptcy proceeding and/or related civil proceedings, and because the criminal case, bankruptcy proceedings, and civil proceedings concern the same money and property, any payments or distributions made to the victim-investors by Motil in the bankruptcy or civil cases should also be credited toward his criminal restitution in this case. To ensure that, the United States asks that the following language be included in the Judgment Entry in the special instructions regarding the payment of monetary penalties:

> The Clerk's Office is to apply any credits to the Defendant's restitution obligation after Defendant's bankruptcy proceedings in the Northern District of Ohio, case numbers 1:22BK10571, 1:22AP1048, 1:22AP1043, 1:22AP1047, 1:22AP1063, 1:22AP1049, 1:22AP1032, 1:22AP1036, 1:22AP1062, and 1:22AP1084 are concluded and the Trustee makes its final distributions and a final accounting is made to the Bankruptcy Court to ensure the Defendant's restitution obligation is accurate and prevents any windfall or double payment to any victim. The Clerk's Office is also, upon proof of payment by Defendant, to credit Defendant with payments made in the related civil cases in Cuyahoga County (21-CV-943792, 21-CV-947790, 21-CV-948656, 21-CV-950029, 21-CV-955184, 21-CV-955914, 21-CV-960844, 24-CV-987530) and Richland County (2021CV0071, 2021CV0164, 2021CV0169, 2021CV302, 2021CV605) as well as any payments made in *Securities and Exchange Commission v. Motil et al.*, 1:23CV1853 (N.D. Ohio).

---

[4] Because the receivership documents indicate that all properties in Motil's portfolio have been accounted for (R. 31-6: Defendant's Sentencing Memorandum Exhibit F, Property Liquidation Details, PageID 590-91), there is no remaining collateral whose fair market value needs to be determined by this Court prior to imposing sentence. *See* U.S.S.G. § 2B1.1 app. n. 3(D)(iii).

Finally, because Motil's restitution obligation is so large, the United States also asks that this Court not impose a fine in this case.

      D.     <u>IN THE ALTERNATIVE, THIS COURT SHOULD HOLD A SEPARATE RESTITUTION HEARING.</u>

If this Court believes that it does not currently have sufficient information to determine the amount of restitution in this case, the United States requests that this matter be set for a separate restitution hearing within 90 days of sentencing pursuant to 18 U.S.C. § 3664(d)(5).

**VI.**    <u>**CONCLUSION**</u>

For the reasons outlined above, this Court should set Motil's total offense level at 28 after the application of all adjustments. Motil's offense conduct and other relevant factors fall squarely within the scope of the facts and circumstances contemplated by the Guidelines; therefore, a Guidelines sentence within the 28/I range will accomplish the goals of 18 U.S.C. § 3553(a). Thus, the United States respectfully requests that the Court impose a sentence of 78-97 months in addition to ordering restitution of 5,085,247.08 as outlined above.

               Respectfully submitted,

               CAROL M. SKUTNIK
               Acting United States Attorney

By:   /s/ Erica D. Barnhill
       Erica D. Barnhill (OH: 0079309)
       Assistant United States Attorney
       United States Court House
       801 West Superior Avenue, Suite 400
       Cleveland, OH 44113
       (216) 622-3967
       (216) 522-2403 (facsimile)
       Erica.Barnhill@usdoj.gov